# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

Case No.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Plaintiff,

v.

SPINE CENTERS OF AMERICA, INC.,
ROBERT CAGNO, LESTER MORALES,
JR., BRIAN CARLTON, DC, ANTHONY
HERNANDEZ, LIFESPINE, LLC,
ZOLTAN BERECZKI, DO, NORTH
FLORIDA ORTHOPEDIC MEDICINE
LLC, GEORGE EL BAHRI, DO,
SURGICAL CENTER OF NORTH
FLORIDA, LLC D/B/A SURGERY
CENTER OF NORTH FLORIDA, AND
LEGACY SURGERY CENTER, LLC,

      Defendants.

_____/

## COMPLAINT

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm Mutual") brings this complaint against Spine Centers of America, Inc. ("Spine Centers"), Robert Cagno ("Cagno"), Lester Morales, Jr. ("Morales"), Brian Carlton, DC ("Carlton"), and Anthony Hernandez ("Hernandez") (collectively, the "Spine Centers Defendants"), and Lifespine, LLC ("Lifespine"), Zoltan Bereczki, DO ("Dr. Bereczki"), North Florida Orthopedic Medicine LLC ("North Florida Ortho"), and George El Bahri (Dr. El Bahri) (collectively, the "Surgeons"), and Surgical Center

of North Florida, LLC d/b/a Surgery Center of North Florida ("Surgery Center of North Florida"), and Legacy Surgery Center, LLC ("Legacy Surgery Center") (collectively, the "Surgery Centers"),[1] and alleges as follows:

## I.    NATURE OF THE ACTION

1.    It is the well-established public policy of the State of Florida to prohibit all forms of patient brokering—the payment of fees or other remuneration directly or indirectly related to the referral of patients to health care providers—in order to safeguard the public health and safety and protect consumers from harm.

2.    Contrary to this well-established public policy, Defendants jointly perpetrated a scheme through which patients were unlawfully brokered to maximize Defendants' financial gains in connection with patients' personal injury claims (referred to herein as the "Unlawful Referral Arrangement").

3.    Pursuant to the Unlawful Referral Arrangement, Spine Centers, the Surgeons, and the Surgery Centers entered into secret agreements through which Spine Centers referred patients to the Surgeons and Surgery Centers for injections and surgical procedures. Then, Spine Centers paid the Surgeons a predetermined flat rate for the professional component of the injections and surgeries and paid the Surgery Centers a predetermined lease payment for use of their facilities. In exchange for the patient referrals, the Surgeons and the Surgery Centers allowed Spine Centers to determine the charges for their services, which greatly exceeded

---

[1] The Spine Centers Defendants, Surgeons, and Surgery Centers are collectively referred to as "Defendants."

what they agreed to accept as payment in full, and collect on the same. The entire arrangement was designed to ensure a flow of patients from Spine Centers to the Surgeons and the Surgery Centers for mutual financial gain.

4.      Defendants submitted, or caused to be submitted, false, incomplete, or misleading information concerning facts material to insurance benefits claims in violation of section 817.234, Florida Statutes, when, among other things, they: generated bills reflecting inflated prices for professional and facility fees; failed to disclose the fact that, pursuant to an illegal patient brokering relationship, Spine Centers paid all amounts due in full for the Surgeons' and Surgery Centers' services, which was a fraction of the prices reflected in the bills and thus, the Surgeons and Surgery Centers were owed nothing; and failed to disclose the amounts they paid the Surgeons and Surgery Centers.

5.      State Farm Mutual's 9810A insurance policy specifically excludes coverage "for any person who, or organization making claim or seeking payment that, has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy." (Emphasis removed).

6.      As detailed herein, the Unlawful Referral Arrangement involved conduct which constitutes: (a) patient brokering, in violation of section 817.505, Florida Statutes; (b) deceptive and unfair trade practices, in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (sections 501.201 to 501.213, Florida Statutes); and (c) the unlawful submission of false, incomplete, or

misleading information concerning facts material to insurance benefits claims in violation of section 817.234, Florida Statutes.

7.     As a result of the scheme, Spine Centers submitted, or caused to be submitted, charges of more than $3.3 million, for inclusion in settlement demands to State Farm Mutual. Spine Centers' charges constituted the vast majority of the medical specials for its patients and frequently exceeded the available policy limits (*see* **Exhibit 1**), which pressured State Farm Mutual into tendering the same in order to avoid a claim of bad faith.

8.     Based on Defendants' conduct, State Farm Mutual asserts claims for unjust enrichment and violations of FDUTPA, plus attorneys' fees and costs under FDUTPA.

## II.     JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to State Farm Mutual's claims occurred in this judicial district.

## III.    THE PARTIES

### A.     Plaintiff

11.    Plaintiff State Farm Mutual is a citizen of the State of Illinois. It is incorporated under the laws of the State of Illinois, with its principal place of

business in Bloomington, Illinois. State Farm Mutual is authorized to conduct business in Florida and issues automobile insurance policies in Florida.

**B.   Defendants**

    **i.   Spine Centers Defendants**

12.    Spine Centers is a Florida corporation that was formed on June 20, 2014, and its principal place of business is 4830 W. Kennedy, Suite 600, Tampa, Florida 33609. Spine Centers was owned by four individuals—Morales, Cagno, Carlton, and Hernandez.

13.    Morales is a citizen of Florida and resides in Orange County. He served as the Chief Executive Officer of Spine Centers. In this role, Morales supervised the day-to-day operations of Spine Centers and was responsible for corporate governance, revenue optimization, and business planning decisions. He was also responsible for developing, managing, and advancing Spine Centers' relationships with the physicians it engaged.

14.    Cagno is a citizen of North Carolina and resides in Wake County. He has served as the Chief Operating Officer of Spine Centers.

15.    Carlton is a citizen of Tennessee and resides in Montgomery County. He is licensed in Florida as a chiropractic physician. Carlton, along with Cagno, were responsible for setting the prices for the services billed by Spine Centers.

16.    Hernandez is a citizen of Florida and resides in Alachua County. Hernandez served as the Chief Marketing Officer of Spine Centers. On or around October 27, 2020, Hernandez was sentenced to six months in federal prison after

Page 5 of 33

pleading guilty to making false statements relating to health care matters and conspiracy to commit money laundering. Specifically, between June 2013 and October 2015, Hernandez defrauded multiple healthcare insurers by submitting false reimbursement claims for allergy shots which were never provided through Gainesville Medical Centers.

### ii.    The Surgeons

17.    Dr. Bereczki is a citizen of Florida and resides in Pinellas County. Dr. Bereczki has been licensed in Florida as an osteopathic physician (OS9841) since June 1, 2006.

18.    Lifespine is a Florida limited liability company, which was formed on July 11, 2018. Dr. Bereczki is the manager of Lifespine, and he is believed to be the sole member of Lifespine.

19.    Dr. El Bahri is a citizen of Florida and resides in Duval County. Dr. El Bahri has been licensed in Florida as an osteopathic physician (OS11856) since August 20, 2012.

20.    North Florida Ortho is a Florida limited liability company, which was formed on October 15, 2018. Dr. El Bahri is the manager of North Florida Ortho. Dr. El Bahri and Jessica El Bahri are the sole members of North Florida Ortho. Jessica El Bahri is a citizen of Florida and resides in Duval County.

### iii.    The Surgery Centers

21.    Surgery Center of North Florida is a Florida limited liability company, which was formed on September 11, 2013. Its principal place of business is 6520

N.W. 9th Blvd., Gainesville, Florida 32605. The members of Surgery Center of North Florida are Harold Locay, M.D., a citizen of Florida and a resident of Pinellas County, and Docfarm Investments, LLC, a Florida limited liability company.[2] Surgery Center of North Florida has been licensed as an ambulatory surgery center (License No. 922) since April 14, 2015.

22.    Legacy Surgery Center is a Florida limited liability company, which was formed on August 23, 2018. It operates from 6918 Gunn Highway, Suite E, Tampa, FL 33625. Legacy Surgery Center has been licensed as an ambulatory surgery center (License No. 1369) since September 11, 2018. The disclosed members of Legacy Surgery Center are Fastmd ASC LLC[3] and Phillip Clifford, a citizen of Florida and a resident of Hillsborough County. Upon information and belief, none of Legacy Surgery Center's members are citizens of Illinois.

## IV.    RELEVANT BACKGROUND

### A.    Automobile Insurance Benefits Under Florida Law

23.    Under Florida law, an automobile owner has the option to purchase bodily injury liability coverage and uninsured motorist coverage in amounts ranging from $10,000 per person, $20,000 per accident to more than $1,000,000 per person and per accident.

---

[2] Gregory Bailey, M.D. is the managing member of Docfarm Investments, LLC, and he is believed to be the sole member of Docfarm Investments, LLC. Dr. Bailey is a citizen of Florida and a resident of Alachua County.

[3] Farhan Siddiqi and Johannes Wijnmaalen are the sole members of Fastmd ASC LLC. Farhan Siddiqi is a citizen of Florida and a resident of Pasco County. Johannes Wijnmaalen is a citizen of Florida and a resident of Pasco County.

24.     When a driver causes an accident ("At-Fault Driver") and has a valid and enforceable bodily injury insurance policy, the insurer that issued the policy may be required to compensate those injured in the accident.

25.     A driver in Florida also has the opportunity to purchase uninsured or underinsured motorist coverage to pay for serious and permanent injury or death to an injured person who is not at fault when the At-Fault Driver either has no insurance or policy limits which are not sufficient to pay for the injured person's serious and permanent injuries.

26.     Thus, injured persons who are not at fault can potentially recover additional insurance benefits: (a) from the At-Fault Driver's insurance company through a bodily injury claim ("BI claim"); and (b) if recovery under the BI Claim is insufficient, from the injured person's own insurance company through an uninsured or underinsured motorist claim ("UM claim").

27.     The benefits potentially available to injured persons through BI and UM claims include reasonable and necessary medical expenses, lost wages, and non-economic damages such as pain and suffering, related to the accident.

28.     Automobile accident victims may recover damages on BI or UM claims for pain, suffering, mental anguish, and inconvenience if the injury consists in whole or in part of: (a) a significant and permanent loss of an important bodily function; (b) a permanent injury within a reasonable degree of medical probability (other than scarring or disfigurement); (c) significant and permanent scarring or disfigurement; or (d) death. *See* Fla. Stat. § 627.737(2).

29.     If an insurer unreasonably declines to settle a BI or UM claim within policy limits, it may be sued by its own insured for breach of contract as well as for bad faith.

30.     If found liable for bad faith, insurers may be required to pay compensatory damages, attorney's fees, and punitive damages.

31.     When medical expenses approach or exceed available policy limits, personal injury plaintiffs' attorneys often threaten insurers with bad faith litigation if they do not settle BI or UM claims within policy limits.

**B.      Florida Law Prohibits Giving or Receiving Anything of Value for Patient Referrals**

32.     The Florida Legislature has repeatedly recognized patient referrals should not be contingent upon receiving or providing something of value. Such arrangements incentivize conduct that is focused on maximizing the financial rewards for the providers rather than delivering the best and most appropriate patient care.

33.     Patient brokering arrangements have the potential to place injured patients at significant risk because they can result in (often) unnecessary procedures, the performance of which carry inherent risk to the patients' health.

34.     To prohibit *quid pro quo* arrangements in which patients are exchanged for value, the Legislature enacted the Patient Brokering Statute (section 817.505, Florida Statutes). This statute broadly prohibits the payment or receipt of cash or in-kind commissions, bonuses, kickbacks, or rebates for referring or soliciting patients. Pursuant to this statute, fee-splitting arrangements are also

prohibited. This public policy is also reiterated in the disciplinary provisions of the statutes governing licensure and regulation of the practice of medicine. *See, e.g.*, Fla. Stat. §§ 458.331(1)(i) and 459.015(1)(j).

35.     Fee-splitting arrangements often apportion the revenue received from the treatment of referred patients between the referring party and the party providing medical treatment or services to patients. For instance, an agreement between a physician and a marketing company under which the marketing company receives a percentage of revenue from new patients generated by its marketing efforts constitutes an unlawful fee-splitting arrangement. *See In re Voltarel*, 236 B.R. 464, 466–67 (M.D. Fla. 1999); *Gold, Vann & White, P.A. v. Freidenstab*, 831 So. 2d 692, 694–95 (Fla. 4th DCA 2002); *Darrin Cupo, D.M.D., P.A. v. OCA, Inc.*, No. 07-5643, 2009 WL 6777926, at *7–9 (E.D. La. Feb. 6, 2009). Similarly, an agreement between an entity, on the one hand, and a surgery center and surgeon, on the other hand, in which the entity receives a referral fee—representing the difference between what it pays the surgery center and the surgeons pursuant to their pre-determined arrangement and the amount the entity bills for the surgeries—for referring patients is also an unlawful fee-splitting arrangement.

36.     The Patient Brokering Statute makes it unlawful for any person, including any health care provider or health care facility, to:

> (a) Offer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral

of a patient or patronage to or from a health care provider or health care facility;

(b) Solicit or receive a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring a patient or patronage to or from a health care provider or health care facility;

(c) Solicit or receive a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgment of treatment from a health care provider or health care facility; or

(d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c).

Fla. Stat. § 817.505(1)(a)–(d).

37.   A violation of the Patient Brokering Statute is a third-degree felony.

*See* Fla. Stat. § 817.505(4).

## C. Florida Law Provides Criminal and Civil Penalties for Insurance Fraud

38.   A person commits insurance fraud if the person "with the intent to injure, defraud, or deceive any insurer:

1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy . . . , knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

2. Prepares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy . . . , knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim[.]

Fla. Stat. § 817.234(1)(a)(1)–(2). A statement "includes, but is not limited to, any notice, statement, proof of loss, bill of lading, invoice, account, estimate of property damages, bill for services, diagnosis, prescription, hospital or doctor records, X ray, test result, or other evidence of loss, injury, or expense." *Id.* § 817.234(6).

39.    Insurance fraud is a felony. *See* Fla. Stat. § 817.234(11).

40.    In addition to criminal liability, a person convicted of violating section 817.234, Florida Statutes, for the purpose of receiving insurance proceeds from a motor vehicle insurance contract is subject to a civil penalty, payable to the Department of Financial Services. *See id.* § 817.234(12).

41.    As detailed below, Defendants' Unlawful Referral Arrangement violated the Patient Brokering Statute and FDUTPA, and the submission of the claims by Defendants to State Farm Mutual to collect charges that were not owed constituted insurance fraud under section 817.234, Florida Statutes.

42.    State Farm Mutual's 9810A insurance policy specifically excludes coverage "for any person who, or organization making claim or seeking payment that, has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy."

43.    Defendants' conduct forming the basis of State Farm Mutual's unjust enrichment and FDUTPA claims was unlawful, unfair, and deceptive, and also violates the foregoing statutes.

## V.    THE ILLEGAL SCHEME

### A.    The Unlawful Referral Arrangement

44.    Pursuant to the Unlawful Referral Arrangement, Spine Centers, the Surgeons, and the Surgery Centers entered into agreements through which Spine Centers referred patients to the Surgeons and Surgery Centers for injections and surgical procedures. Then, Spine Centers paid the Surgeons a predetermined flat rate for the professional component of the injections and surgeries and paid the Surgery Centers a predetermined lease payment for the use of their facilities. In exchange for the referrals, the Surgeons and the Surgery Centers allowed Spine Centers to determine the charges for their services, which greatly exceeded what they agreed to accept as payment in full and collect on same. The entire arrangement was designed to ensure a flow of patients from Spine Centers to the Surgeons and the Surgery Centers for mutual financial gain.

45.    The first component of the injection or surgery subject to the Unlawful Referral Arrangement is the professional component, which covers the cost of the physician's professional services. The second is the technical component, which is provided by a hospital or surgery center and covers the use of equipment, facilities, non-physician medical staff, and supplies.

46.    As discussed in greater detail below, Spine Centers' role is limited to that of a middleman—referring patients and billing for the referred services. Spine Centers did not provide either the professional or the technical component of the injections or surgeries. Rather, Spine Centers contracted with Dr. Bereczki and Dr.

El Bahri to perform the professional component. Dr. Bereczki and Dr. El Bahri were engaged by Spine Centers as independent contractors through Lifespine and North Florida Ortho respectively. Similarly, Spine Centers contracted the technical component to Surgery Center of North Florida and Legacy Surgery Center pursuant to a lease arrangement.

47.     Spine Centers profited from the referrals by generating bills which vastly exceeded the amounts paid to Lifespine, North Florida Ortho, Surgery Center of North Florida, and Legacy Surgery Center for their services and attempting to collect on same.

### B.     Spine Centers—the Middleman

48.     Spine Centers' role in the scheme was that of a middleman—also often referred to as a broker. The first aspect of this role involved cultivating relationships with healthcare providers that treat auto accident patients in order to secure a steady stream of in-bound referrals to Spine Centers. As Andrew Messer, M.D., who was previously engaged by Spine Centers, stated: Spine Centers "do[es] all the marketing promotions, and they generate the patients." *See* **Exhibit 2** (Nov. 19, 2018 Dr. Messer Dep. Tr. 10:18-11:10).

49.     Hernandez was responsible for Spine Centers' marketing efforts and served as its Chief Marketing Officer.

50.     Carlton also played a significant role in Spine Centers' marketing efforts. Specifically, a clinic which he owned, BC Health Care Consulting, LLC d/b/a West Pasco Spine & Injury referred patients to Spine Centers.

**C.    Lifespine and North Florida Ortho—the Contracted Surgeons**

51.    Spine Centers is not owned by medical doctors. Nor does it employ any medical doctors. Thus, Spine Centers cannot perform the professional component of an injection or surgery. Instead, Spine Centers contracted the professional component of surgery to Lifespine, which employs Dr. Bereczki, and North Florida Ortho, which employs Dr. El Bahri. *See* **Exhibit 3** (Aug. 31, 2020 Dr. Bereczki Dep. Tr. 16:11-16; 18:2-10); **Exhibit 4** (Nov. 18, 2020 Dr. El Bahri Dep. Tr. 9:21-10:13).

52.    Lifespine and North Florida Ortho are paid by Spine Centers a predetermined amount based on the Medicare Fee Schedule for each service they perform on a patient referred by Spine Centers. Dr. Bereczki has testified in this regard:

> Q.    In terms of your compensation with Spine Centers of America, how are you compensated?
>
> A.    I get paid a standard fee for service.
>
> Q.    I'm sorry.· Can you explain what you mean?
>
> A.    Each procedure has a value, and I get paid a fee for service.
>
> ...
>
> Q.    And then for a surgery, is it, "If I perform this certain type of surgery, this is the price I get"? Just one fee?
>
> A.    Correct.

**Exhibit 3** (Aug. 31, 2020 Dr. Bereczki Dep. Tr. 94:4-95:19).

53.     When asked whether his fee for the surgery performed on the patient was equal to the professional fee billed by Spine Centers—$47,688—Dr. Bereczki laughed and stated his fee "was not even close." *See id.* at 95:20-97:4. Dr. Bereczki stated he was only paid approximately $2,000, which is only 4% of the professional fee billed by Spine Centers. *See id.; see also* **Exhibit 4** (Nov. 18, 2020 Dr. El Bahri Dep. Tr. 33:21-25; 36:25-37:6) (Dr. El Bahri is paid by Spine Centers within a rolling 45 days after the surgery, but refused to answer whether he was paid by procedure).

54.     In exchange for the patient referrals and the predetermined payments they received, Lifespine and North Florida Ortho allowed Spine Centers to bill for the procedures they performed. Spine Centers generated the bill on a UB-04 claim form. The "provider" charge on the UB-04 claim form constitutes the charge for the services rendered by Lifespine and North Florida Ortho. The "provider" charges for the procedures at issue range between $4,410 and $16,027 for injections and $19,742 and $58,709 for surgeries. Spine Centers determined the amount of the "provider" charge independently, without regard to the predetermined rate paid to Lifespine and North Florida Ortho.

55.     Lifespine and North Florida Ortho did not receive any payments beyond the predetermined rates paid by Spine Centers for each procedure, such as a bonus based on how a patient's injury case resolved. *See* **Exhibit 3** (Aug. 31, 2020 Dr. Bereczki Dep. Tr. 98:10-22. This ensured the Spine Centers Defendants

were the ones who profited from their referral despite not providing any of the services to the patients.

### D.   Surgery Center of North Florida and Legacy Surgery Center – the Contracted Surgery Centers

56.    Spine Centers developed a relationship with Surgery Center of North Florida and Legacy Surgery Center, which are the locations where the Lifespine and North Florida Ortho physicians performed injections or surgeries on the patients at issue in this action. Like the relationship with Lifespine and North Florida Ortho, Spine Centers paid the Surgery Centers a pre-arranged lease payment for the use of their facilities.

57.    In exchange for the patient referrals and the predetermined payments they received, Surgery Center of North Florida and Legacy Surgery Center authorized Spine Centers to submit bills to insurers for rates determined by Spine Centers and without any acknowledgment or notification of the prior payments made. The "facility" charge on the UB-04 claim form generated by Spine Centers constitutes the charge for the services rendered by Surgery Center of North Florida and Legacy Surgery Center. The "facility" charges for the procedures at issue range between $5,550 and $28,189 for injections and $33,564 and $69,847 for surgeries. Spine Centers determined the amount of the "facility" charge independently, without regard to the predetermined rate paid to Surgery Center of North Florida and Legacy Surgery Center.

58.    In sum, Spine Centers billed for the technical and professional components of surgeries that were actually provided by the Surgery Centers and

the Surgeons. The payment sought by Spine Centers resulted in an illegal fee-split for the surgeries performed by the Surgery Centers and the Surgeons. In essence, Spine Centers received a referral fee, which is the difference between what it paid the Surgery Center and the Surgeons pursuant to their pre-determined arrangement and the amount Spine Centers collected for the surgeries, for brokering patients.

### E. False and Materially Misleading Statements Sent to Patients' Attorneys for Transmission to State Farm Mutual

59.     At the outset, before a single injection or surgery was performed, Defendants agreed Spine Centers would send the Surgeons and the Surgery Centers patients and pay the Surgeons and Surgery Centers a pre-negotiated amount for each of those patients' surgeries.

60.     In exchange, the Surgeons and the Surgery Centers allowed Spine Centers to determine the amounts charged for their services and generate a bill reflecting the same, which was an order of magnitude higher than the pre-negotiated amount paid to the Surgeons and Surgery Centers. Further, the amount Spine Centers placed on the bills (the amount submitted to State Farm Mutual) was unrelated to the amount it paid to the Surgeons and the Surgery Centers.

61.     The result was Spine Centers' bills constituted the vast majority of the medical bills submitted to State Farm Mutual for purported medical expenses.

62.     Once all of the bills were received, including Spine Centers' inflated global bills for injection and surgery (the "Global Bills"), the patients' personal

injury attorneys would then compile a demand package which was to be submitted to State Farm Mutual.

63.    In fact, Spine Centers' bills alone frequently exceeded the available policy limits and thus, pressured State Farm Mutual into tendering the same in order to avoid a claim of bad faith. *See* **Exhibit 1**.

64.    These false and misleading packages included the Global Bills generated by Spine Centers reflecting the alleged gross charges for the Surgeons' and Surgery Centers' services and did not disclose those combined surgical charges were the product of the Unlawful Referral Arrangement.

65.    At all times, Defendants knew Spine Centers' Global Bills would be provided to insurance companies, like State Farm Mutual, in connection with patients' claims and demands for payment.

66.    In a typical scenario, the lawyer for the patient makes a monetary demand to the insurer based on the injuries purportedly sustained by the patient. A significant component of the monetary demand is the alleged charges for the medical services the patient incurred as a result of the accident. The insurer, such as State Farm Mutual, then evaluates several factors in determining whether to settle the claim, including, the nature and amount of medical expenses, and the risk of exposing its insureds to a judgment exceeding available policy limits which, in turn, can lead to personal liability to its insureds and bad faith exposure if the insurer declines to settle within policy limits. If found liable for bad faith, insurers

may be required to pay compensatory and consequential damages, attorney's fees, and punitive damages. *See* Fla. Stat. § 624.155.

67.    All Defendants knew the purpose of these packages was to provide information and invoices for the patients' attorneys to use in demands to insurance companies and, thereby, stake Spine Centers' claim to money from any settlements or judgments the patients obtained.

68.    The false and misleading packages did not disclose: (1) Spine Centers' bills included in the demand packages were the product of the Unlawful Referral Arrangement; (2) Spine Centers did not perform any of the services for which it billed, but rather brokered the patients to Lifespine, North Florida Ortho, Surgery Center of North Florida, and Legacy Surgery Center; or (3) the amount Spine Centers actually paid to Lifespine, North Florida Ortho, Surgery Center of North Florida, and Legacy Surgery Center, which they accepted as payment in full for the services they rendered.

69.    The demand packages typically included a letter crafted to exert pressure on State Farm Mutual to settle the claims. Such letters demanded a response within a relatively short time and often contained threats of bad faith claims against State Farm Mutual. If State Farm Mutual did not accede to the demands, then the attorneys would often file a Civil Remedy Notice of Insurer Violations ("CRN") with the Florida Department of Financial Services.

70.    Examples of this tactic can be seen in the following:

- Vincent Pawlowski of Pawlowski Mastrilli Law Group sent a 20-day time limit demand on November 13, 2018, on behalf of Patient Z.P. (Claim No. 592381S80) which sought the full policy limits of $100,000. On December 7, 2018, Mr. Pawlowski sent a draft complaint and stated "you may wish to explain to your policyholders, that State Farm Insurance had an opportunity to settle this case within available limits and chose not to do so." On January 4, 2019, Mr. Pawlowski filed a CRN and alleged State Farm Mutual was not attempting in good faith to settle the claim.

- Chris Chenevey of Steven A. Bagen & Associates, P.A. sent a time-limit demand on March 29, 2021, on behalf of patient RD (Claim No. 59C3399W7), which sought the full policy limits of $100,000. Mr. Chenevey placed a "strict thirty (30) day time limit" on the demand and stated: "If we have not heard from you within that time, we will be left to assume that litigation is the only option to us to resolve this matter and we will commence service upon your insured immediately. If we are forced to file a lawsuit, we will no longer be willing to resolve the case at a later time for $100.000.00."

- Nicolette Nicoletti of the Nicoletti Law Firm sent a time-limit demand on June 27, 2022, on behalf of patient DR (Claim No. 5926J736K), which sought the full policy limits of $500,000. The demand provides: "there is a duty on the part of State Farm to act as a fiduciary to your insured. An insurance company has the duty to settle a pending case within the confines of its policy limits when the probability of an adverse finding is great and there is a substantial likelihood of the plaintiff prevailing on the merits of their case. *Campbell v. Geico*, 306 So. 2nd 525 (Fla. 1974)." (Emphasis removed).

71.     Consequently, State Farm Mutual frequently had to evaluate demand packages under considerable threats from patients' personal injury attorneys to quickly resolve claims in order to avoid exposing insureds to judgments in excess of their policy limits and to reduce the potential for bad faith litigation.

72.     As discussed below, State Farm Mutual relied on false or misleading representations and omissions made in furtherance of the Unlawful Referral Arrangement.

**F.    State Farm Mutual Relied on False or Misleading Representations and Omissions Made by Defendants in Furtherance of the Unlawful Referral Arrangement**

73.    State Farm Mutual has the right under its policies to investigate, negotiate, and settle any claim or lawsuit. For each of the claims identified on **Exhibit 1**, State Farm Mutual reviewed and evaluated all documentation and information submitted in connection with each claim.

74.    In evaluating settlement demands and resulting settlement terms for each BI and UM claim on **Exhibit 1**, State Farm Mutual's claims representatives— who are responsible for making settlement decisions—referred to and relied upon the demand letters and follow-up correspondence from the patients' counsel as well as the medical records, bills, invoices, and other documentation supplied to evaluate and properly adjust each patient's claim.

75.    Moreover, Spine Centers submitted its Global Bills on a UB-04 claim form. The backside of the UB-04 claim form states "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Thus, by submitting the Global Bills on the UB-04 claim form, Defendants certified their claims were honest, truthful, complete, and lawful.

76.    State Farm Mutual's claims representatives relied on the representation that the patients owed the amounts listed on Spine Centers' Global Bills or in the medical records, when in fact, because of the Unlawful Referral

Arrangement and Defendants' false statements, State Farm Mutual and the patients did not owe these amounts.

77.     At the time State Farm Mutual evaluated and settled the claims identified in **Exhibit 1**, the claims representatives were unaware of the Unlawful Referral Arrangement.

78.     The amounts of the Global Bills submitted in these claims to State Farm Mutual were the majority of the aggregate medical expenses and had the effect of increasing the value of the claim to amounts that approached or exceeded available policy limits. *See* **Exhibit 1**. As such, these charges posed the threat of significant exposure for State Farm Mutual and its insureds if the cases proceeded to trial, and were therefore always a substantial factor, and typically the most significant factor, relied upon by State Farm Mutual's claims representatives in their evaluation and settlement of the claims at issue.

79.     These Global Bills and demand letters concealed from State Farm Mutual that: (a) Spine Centers, the Surgeons and the Surgery Centers had a predetermined, undisclosed arrangement; (b) pursuant to which Spine Centers paid the Surgeons and the Surgery Centers a fixed rate; (c) the patients did not owe the charges because of the Unlawful Referral Arrangement; and (d) Spine Centers' Global Bills reflected charges that were, in many cases, significantly higher than the amount accepted from Spine Centers as payment in full.

80.     Had State Farm Mutual known the truth of the Unlawful Referral Arrangement among Defendants, State Farm Mutual would not have paid the

settlements for the claims identified in **Exhibit 1** because State Farm Mutual could have appropriately considered Defendants' unlawful conduct and false statements when evaluating the claims.

81.    As a consequence of its reliance, State Farm Mutual was induced to pay more than $3 million to resolve BI and UM claims involving Defendants' fraudulent and unlawful invoices. This amount is significantly more than State Farm Mutual would have paid had it been supplied with complete, accurate and truthful information concerning the Unlawful Referral Arrangement.

### G.    Defendants' Conduct Violated Florida Law and Is Contrary to Public Policy

82.    The policies of insurance issued by State Farm Mutual obligated State Farm Mutual to pay for damages or covered losses for which State Farm's insureds were legally liable to pay, up to the policies' respective limits. State Farm Mutual's insureds are not legally liable for Spine Centers' inflated charges resulting from conduct prohibited by Florida law, and State Farm Mutual should have been able to disregard such charges in adjusting claims without concern that failing to account for or consider the fruits of Defendants' unlawful activities could negatively impact State Farm Mutual's insureds.

83.    Defendants' conduct violated section 817.505, Florida Statutes (prohibiting paying or receiving any type of "bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind" for referring patients to or from a health care provider) and section 456.054(2), Florida Statutes (prohibiting any health care provider from offering, paying, soliciting, or receiving "a kickback, directly or

indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients").

84.     Moreover, agreements (such as the Unlawful Referral Arrangement) that call for the doing of, or are entered into for the purpose of doing, an illegal or prohibited act in violation of the public policy of the State as expressed by the Legislature are void and unenforceable. The burden of complying with applicable statutes and regulations should be borne entirely by the party subject to the regulation—here, Defendants. This concept is often expressed using the well-settled principle that a wrongdoer may not benefit from his own wrongdoing, and under this rationale, Florida courts routinely refuse to lend the judicial power of the State to effectuate or protect violations of public policy.

85.     Spine Centers' inflated Global Bills constituted a kickback or rebate that the Surgeons and Surgery Centers provided and Spine Centers received in exchange for Spine Centers' referrals to the Surgeons and Surgery Centers in violation of section 817.505, Florida Statutes, which prohibits engaging "in any fee-split arrangement" for referring patients to or from a health care provider. The arrangement was further violative of the foregoing statutes because the amount Spine Centers obtained from settlement proceeds above the amount it paid for the Global Bills constituted an indirect kickback or commission that Spine Centers would not have received without presentation of the inflated Global Bills.

86.     The arrangement was illegal because Spine Centers received a discount or rebate on the amount of the surgical charges in exchange for patient

referrals. The significant discount constitutes a kickback under section 817.505, Florida Statutes.

87.     Further, any person who makes any statement that is intended to be presented to an insurer in connection with, or in support of, any claim for payment knowing that the statement "contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" commits insurance fraud. Fla. Stat. § 817.234(1)(a)(2).

88.     Similarly, any person who causes any statement to be presented to an insurer as part of, or in support of, a claim for payment knowing that the statement "contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" commits insurance fraud. Fla. Stat. § 817.234(1)(a)(1).

89.     Section 817.234, Florida Statutes, entitles State Farm Mutual to complete, accurate information that is material to a claim for payment. In other words, as a matter of public policy, the Legislature determined insurance carriers like State Farm Mutual are entitled to full and accurate information in connection with claim evaluation.

90.     Here, State Farm Mutual did not receive complete and accurate material information from Defendants. Defendants knew Spine Centers' Global Bills contained false, incomplete, and misleading information because they knew: (a) the Global Bills were the product of the Unlawful Referral Arrangement; and (b) the Global Bills falsely represented the Surgeons and the Surgery Centers'

charges were their gross charges when, in fact, the charges were significantly higher than the amounts the Surgeons and Surgery Centers accepted from Spine Centers in full satisfaction of their services for the patients whose treatments are at issue.

91. When State Farm Mutual receives a demand for payment of insurance benefits for damages caused by the acts of its insured, State Farm Mutual relies on material information to appropriately evaluate the demand. Here, the material information provided to State Farm Mutual's claims representatives failed to include the following facts: (a) the combined surgical charges were the product of the Unlawful Referral Arrangement, for which State Farm Mutual's insured was not legally liable; (b) the amounts Spine Centers paid to the Surgeons and Surgery Centers; and (c) the Surgeons and Surgery Centers were not seeking any further payment. In fact, the scheme was specifically designed to cause State Farm Mutual to believe that if State Farm Mutual did not satisfy the demand and settle the case, State Farm Mutual and/or its insureds would face significant liability based on the full amount of the stated charges from Spine Centers.

## VI.  CLAIMS FOR RELIEF

### First Claim for Relief
(Against All Defendants for Violations of FDUTPA)

92. State Farm Mutual incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 91 above.

93.     In each claim identified in **Exhibit 1**, related to the Unlawful Referral Arrangement, Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of FDUTPA.

94.     These practices include brokering patients in violation of section 817.505, Florida Statutes. Pursuant to the Unlawful Referral Arrangement, Spine Centers, the Surgeons, and the Surgery Centers entered into agreements through which Spine Centers referred patients to the Surgeons and Surgery Centers for injections and surgical procedures. Then, Spine Centers paid the Surgeons a predetermined flat rate for the professional component of the injections and surgeries and paid the Surgery Centers a predetermined lease payment for use of their facilities. In exchange for the patient referrals, the Surgeons and the Surgery Centers allowed Spine Centers to determine the charges for their services, which greatly exceeded what they agreed to accept as payment in full, and collect on the same. The entire arrangement was designed to ensure a flow of patients from Spine Centers to the Surgeons and the Surgery Centers for mutual financial gain.

95.     These practices also include violating the Insurance Fraud Statute, which provides in relevant part:

> (1)(a) A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer:
>
> 1. Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

> 2. Prepares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim;

Fla. Stat. § 817.234(1)(a)(1)-(2).

96.     Defendants violated the Insurance Fraud Statute by, among other things, submitting, or causing to be submitted, bills and supporting documentation that were fraudulent in that they represented the services were lawfully rendered when, in fact, the services were provided pursuant to the Unlawful Referral Arrangement.

97.     Further, section 626.9541, Florida Statutes, defines knowingly presenting or causing "to be presented to any insurer a false claim for payment" as "an unfair or deceptive act." Fla. Stat. § 626.9541(1)(u).

98.     Defendants knowingly presented or caused to be presented a false claim for payment when they provided Spine Centers' Global Bills to the patients' personal injury attorneys for inclusion in demand packages sent to State Farm Mutual.

99.     Accordingly, this conduct is *per se* unfair or deceptive under FDUTPA.

100.    In addition, Defendants' conduct described herein was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing the surgical charges were owed, when

in fact, they should not have been owed as they were the product of Defendants' deliberate violations of Florida law and established public policy.

101.   Further, Defendants' conduct described herein was unfair. The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous. This conduct produced no benefits to consumers or competition.

102.   Defendants are jointly liable for the false claims submitted to State Farm Mutual because they each played an essential role as the orchestrators of the Unlawful Referral Arrangement.

103.   As a result of Defendants' deceptive and unfair practices, State Farm Mutual was aggrieved and suffered actual damages in excess of $75,000.

104.   State Farm Mutual's 9810A insurance policy specifically excludes coverage "for any person who, or organization making claim or seeking payment that, has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy."

105.   State Farm Mutual seeks an award of attorney's fees pursuant to section 502.2105(1), Florida Statutes.

WHEREFORE, State Farm Mutual respectfully requests this Court to enter judgment in its favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against Defendants, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### Second Claim for Relief

(Against All Defendants for Unjust Enrichment)

106.    State Farm Mutual incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 91 above.

107.    The Spine Centers Defendants submitted charges of more than $3.3 million and supporting documentation, for inclusion in settlement demands to State Farm Mutual. *See* **Exhibit 1**.

108.    Following the resolution of each patient's BI or UM claim, State Farm Mutual conferred a benefit upon Defendants by issuing a settlement payment to the patient's attorney. *See* **Exhibit 1**. The patient's attorney in turn remitted a portion of that settlement payment to Spine Centers, which held a medical lien on the settlement proceeds. Defendants voluntarily accepted and have retained the benefit of those settlement payments.

109.    Morales, Cagno, Carlton, and Hernandez received a benefit through their ownership and control of Spine Centers and through payments made to them by Spine Centers.

110.    The Surgeons and the Surgery Centers also derived a benefit from the Unlawful Referral Arrangement because they acted in concert with Spine Centers to broker patients. They received a benefit from the predetermined payments made to them by Spine Centers for the professional and technical components of the services they performed.

111.    Because Defendants made false statements with the intent to conceal or misrepresent material facts and circumstances with their claims and knowingly

submitted, or caused to be submitted, charges for services that were not lawfully rendered, but rather were the product of the Unlawful Referral Arrangement—a fraudulent and unlawful scheme orchestrated by Defendants in violation of Florida law and established public policy—the circumstances are such that it would be unequitable to allow them to retain the benefit of the monies paid.

112.   Defendants are required to disgorge any and all payments received pursuant to the Unlawful Referral Arrangement, which violated the terms of State Farm Mutual's 9810A insurance policy and the strong public policy of the State of Florida as expressed by the Legislature in Florida's patient brokering laws.

113.   Defendants are jointly liable for the fraudulent and misleading invoices and supporting documentation generated and submitted to State Farm Mutual, because they each played an essential role as the orchestrators of the Unlawful Referral Arrangement.

114.   As a result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched for bills that were submitted to State Farm Mutual in demand packages which resulted in total settlements in excess of $3 million.

115.   Under these circumstances, Defendants' retention of benefits paid by State Farm Mutual would be inequitable.

WHEREFORE, State Farm Mutual respectfully requests this Court to enter judgment in its favor and require Defendants to disgorge State Farm Mutual's

payments—which they have unjustly retained—interest thereon, and costs and grant such other relief as the Court deems just and appropriate.

### <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated:  May 3, 2024

By: */s/  David I. Spector*
David I. Spector, **Trial Counsel**
Fla. Bar No. 086540
James J. Duffy
Fla. Bar No. 0068662
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive
Suite 1900 – West Tower
West Palm Beach, Florida 33401
Telephone:  (561) 833-2000
Facsimile:   (561) 650-8399
david.spector@hklaw.com
james.duffy@hklaw.com

*Attorneys for Plaintiff*